UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

EMILY MURDOCH,

Plaintiff,

v.

Case No. 26-cv-____________
HON. ______________________

CITY OF DEARBORN HEIGHTS and
SHAUN PAWLUS,

Defendants.
___________________________________/

Eric Stempien (P58703)
Mallorie M. Blaylock-Danna (P84331)
STEMPIEN LAW, PLLC
Attorneys for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
P/F: 734-744-7002
eric@stempien.com
mallorie@stempien.com
___________________________________________________________________/

**COMPLAINT AND JURY DEMAND**

Plaintiff, Emily Murdoch, by and through her attorneys, Stempien Law, PLLC, hereby complains against Defendants, City of Dearborn Heights and Shaun Pawlus, jointly and severally, and in support thereof states:

1. Plaintiff Emily Murdoch ("Murdoch" or "Plaintiff") is a resident of the County of Wayne, State of Michigan.

2. Defendant City of Dearborn Heights ("Defendant") is a political subdivision of the State of Michigan duly authorized and operating pursuant to the Constitution and statutes of the State of Michigan.

3. Defendant Shaun Pawlus ("Captain Pawlus") was, at all relevant times, employed by Defendant as the Road Patrol Captain for the City of Dearborn Heights Police Department.

4. When the events alleged in this Complaint occurred, Captain Pawlus was acting within the scope of his employment and under color of law.

5. At all material times, Defendant employed Captain Pawlus and is liable for his acts.

6. Defendant is also liable to Plaintiff because of its policies, practices, and customs, which led to this complaint of violation.

7. Jurisdiction is vested with this Court pursuant to 28 USC §1331, 42 USC §2000e, *et seq*., 28 USC §1367, and 42 USC §12101, *et seq*.

8. This action arises under the Constitution and statutes of the United States and State of Michigan.

9. The events giving rise to this action occurred within the Eastern District of Michigan.

10. On or about October 17, 2025, Murdoch filed a Charge of Discrimination with the Michigan Department of Civil Rights ("MDCR") and Equal Employment

Opportunity Commission ("EEOC") concerning Defendant and the Dearborn Heights Police Department.

11. The MDCR assigned No. 662108 to Murdoch's Charge.

12. The EEOC assigned No. 23A-2026-00302 to Murdoch's Charge.

13. On or about July 16, 2026, the EEOC issued a Notice of Right to Sue to Murdoch upon her request to pursue this matter in court.

## GENERAL ALLEGATIONS

14. Murdoch's race is Native American, a/k/a American Indian.

15. Murdoch's national origin is the United States and she is a member of the Saginaw Chippewa Indian Tribe of Michigan.

16. On or about November 30, 2017, Murdoch began her employment with Defendant as a police officer of the Dearborn Heights Police Department ("DHPD").

17. During her tenure with the DHPD, Murdoch was subjected to discrimination, harassment, and retaliation based on race, national origin, and disability, as well as unlawful search and seizure.

18. The City of Dearborn Heights' population is largely Middle Eastern and Arabic speaking.

19. As a Native American and DHPD Officer, Murdoch sought innovative ways for Defendant to be more inclusive and to establish a trusting relationship

between the DHPD and the diverse community the DHPD is entrusted with policing.

20. Murdoch designed a bilingual patch that featured the state seal of Michigan in the center, with the words "Dearborn Heights Police" in both English and Arabic ("the patch").

21. Murdoch designed the patch to celebrate community diversity.

22. The patch was to be optional for DHPD officers to purchase at their sole discretion.

23. No DHPD officers were to be required to dawn the patch on their uniform if they did not desire to wear it.

24. On or about September 3, 2025, Murdoch showed the patch's design to Chief Ahmed Haidar of the DHPD ("Chief Haidar").

25. On or about September 3, 2025, Chief Haidar approved the patch's design, which he immediately disbursed to the entire DHPD and local news outlets.

26. The mere announcement of the patch caused internal outcry within the DHPD.

27. On or about September 3, 2025, Sgt. Nick Szopko ("Szopko") texted Murdoch, mocked her, and asked if the patch was fake.

28. On or about September 3, 2025, Sgt. Christopher Suggs ("Suggs") confronted Murdoch in an aggressive manner and told her to make a Polish patch.

29. Sgt. Ahmad Mazloum ("Mazloum") immediately interjected, scolded Suggs, and told Suggs, 'that is not what you are learning in staff and command!'

30. On or about September 3, 2025, Murdoch's Union President, Brian Sznyr ("Sznyr") sent a mass email to Defendant's police department members alleging that the patch violated the Collective Bargaining Agreement ("CBA"), and requesting that Union members email him directly in furtherance of filing a class action grievance concerning the patch.

31. By September 4, 2025, introduction of the patch had caused social media and news attention, as well as backlash directed at Murdoch specifically.

32. By September 4, 2025, Murdoch was receiving threats at work, including death threats, and she began fearing for her, her husband's, and their children's safety.

33. On or about September 5, 2025, Sznyr concocted a false narrative and issued a press release on behalf of the Dearborn Heights Police Officers Association ("DHPOA") alleging that Murdoch's "original intent of designing this patch was to have a commemorative patch for Dearborn Heights Officers to wear during the month of Ramadan, in support of our Muslim community."

34. Murdoch attempted to correct and rephrase Sznyr's false narrative multiple times, to no avail, and Sznyr disseminated the false press release to local news stations.

35. Murdoch reported Sznyr's false narrative to Captain Jake Hatten ("Captain Hatten"), and Captain Hatten advised Murdoch that Sznyr was changing the narrative because 'he's in a little war with Haidar now.'

36. On or about September 4, 2025, Sznyr threatened Murdoch, stating that 'anyone of sound mind should know that they will face negative feedback for making an Arabic patch for Muslims.'

37. Sznyr filed a complaint with Defendant alleging that the patch was causing him to be discriminated against.

38. Murdoch reported Sznyr's discriminatory and harassing behavior to Captain Hatten; Captain Hatten advised Murdoch that she was just a pawn for Sznyr's discrimination complaint; that Szopko wanted to use the patch against Chief Haidar; that he (Hatten) does not believe the patch caused Sznyr any stress; and that Sznyr is 'a piece of s**t.'

39. On or about September 6, 2025, Murdoch's POAM Business Agent, David Lamontaine ("LaMontaine"), compared Murdoch to a jihadist, specifically, Lamontaine told Murdoch that Sznyr was trying to make Murdoch 'not look like a dirty rotten no good Muslim jihadist.'

40. Between approximately September 4, 2025 and September 8, 2025, Murdoch reported inappropriate workplace comments related to the patch and filed internal complaints and grievances regarding the same with Defendant.

41. On or about September 6, 2025, Murdoch reported Sznyr's, Szopko's, and Suggs' discriminatory and harassing conduct to Defendant.

42. On or about September 6, 2025, Chief Haidar warned Murdoch that she may be retaliated against by members of her Union.

43. On or about September 6, 2025, Chief Haidar changed Murdoch's duty assignment from the front desk to an administrative role where she was assigned to work at Chief Haidar's office.

44. On or about September 6, 2025, Captain Hatten informed Murdoch that Sznyr requested a formal investigation into Murdoch.

45. On or about September 6, 2025, Murdoch reported to Captain Hatten that Sznyr's request for Murdoch to be investigated was retaliation, but this reported retaliation was never investigated by Defendant, and Captain Hatten, during an October 8, 2025 interrogation, denied that Sznyr ever requested such an investigation, but documents secured via the Freedom of Information Act ("FOIA") revealed that Sznyr explicitly requested that Murdoch be investigated.

46. On or about September 6, 2025, Sznyr sent an email stating, "I have been made aware that Officer Murdoch made claims to this administration that the press release was not based in fact" and "I respectfully request that the administration investigate the now clear politically motivated contradiction to

the press release and make an objective determination of what was stated, and concerns raised prior to the dissemination of the press release."

47. On or about September 8, 2025 around 9:00 a.m., Murdoch lodged formal complaints against Defendant with Defendant's Human Resources Director, DuJuan Fisher ("HR Director Fisher") via an email to HR Director Fisher requesting that Murdoch's formal complaints be formally and properly investigated.

48. On or about September 8, 2025 around 11:00 a.m., Murdoch attended an emergency meeting orchestrated by Chief Haidar, with the City of Dearborn Heights Mayor, Bill Bazzi ("Mayor Bazzi"); Corporation Counsel, Roger Farina; and Chief Haidar, in which Murdoch reported discrimination, retaliation, unfair treatment, and a hostile work environment.

49. On or about September 8, 2025, Murdoch's Union, the Police Officers Association of Michigan ("POAM"), advised Murdoch that there is nothing they can do about Sznyr lying.

50. On or about September 8, 2025, Murdoch advised HR Director Fisher that she was seeking administrative leave due to stress and severe anxiety.

51. On or about September 8, 2025, Mayor Bazzi sent an email to Defendant's employees acknowledging the complaints lodged by Murdoch, stating, "I want to be very clear – we have a zero tolerance for violence, sexual

harassment, and discrimination in our City. These behaviors will not be accepted in our workplaces, in our public places, or in our neighborhoods."

52. On or about September 9, 2025, Chief Haidar placed Murdoch on administrative leave for stress associated with her workplace conditions and a hostile environment, pending a fitness for duty assessment.

53. On or about September 9, 2025, Chief Haidar issued a public statement stating that, "[c]ontrary to rumors, this patch had nothing to do with Islamic law and Ramadan…"

54. On or about September 10, 2025, Defendant's HR ordered Murdoch to undergo a fitness for duty assessment.

55. On or about September 10, 2025, Mayor Bazzi, upon review of the complaints lodged by Murdoch, issued a statement stating that Murdoch "is a dedicated professional with an unblemished record of service," that the patch "had nothing to do with religion or ideology," and the "police union's recent statement mischaracterized the facts . . . It is reckless and irresponsible to spread false claims, threaten fellow officers, and jeopardize public safety for political gain."

56. On or about September 22, 2025, Murdoch presented for what Defendant advised her was a fitness for duty assessment.

57. Murdoch was advised by the physician conducting the 9/22/25 assessment – Dr. Janka, a contracted psychologist for Defendant – that it was not a fitness for duty assessment because Murdoch was already off work.

58. Murdoch was found to be able to return to work following the 9/22/25 assessment.

59. After completing the 9/22/25 assessment, Murdoch immediately drove to HR and advised HR Director Fisher that the assessment she underwent was not a fitness for duty assessment because she was already off work, and as a result, she was not permitted to return to work even though she was found to be fit for duty.

60. HR Director Fisher stated that he would 'look into it' and 'get back to' Murdoch.

61. On or about September 22, 2025, Murdoch was medically cleared to return to work with restrictions, including administrative duty placement.

62. On or about September 30, 2025, Captain Pawlus called Murdoch; ordered her to return to work the following day with no notice; claimed that HR was supposed to tell Murdoch the prior week that she would be on the schedule for the week of 10/01/25; claimed that a breakdown in communication caused Murdoch to not receive notice that she was to return to work; alleged that he would order Suggs to not interact with Murdoch at work; and stated that he

would take Murdoch to HR, personally, for a meeting to discuss her 9/8/25 complaints.

63. On or about October 1, 2025, Murdoch returned to her workplace and was ordered to work in the dispatch section of the DHPD where she worked under Suggs, as he was the commanding officer of the dispatch center.

64. On or about October 1, 2025, HR Director Fisher advised Murdoch that he conducted an 'informal assessment' into her 9/8/25 complaints and 'everything seems okay.'

65. On or about October 1, 2025, Murdoch told HR Director Fisher that is not a proper investigation and she reiterated that Defendant needs to conduct a *formal* investigation as requested on 9/8/25.

66. Murdoch worked between October 1, 2025 and October 8, 2025, without undergoing the prerequisite fitness for duty assessment.

67. In or about September of 2025, Sznyr stated that Murdoch was 'digging herself a deeper and deeper hole.'

68. On or about October 8, 2025, Captain Pawlus informed Murdoch that Ofc. Serkoat Kokoiy ("Kokoiy") would be filing Murdoch's grievances regarding her complaints.

69. On or about October 8, 2025, Murdoch contacted Kokoiy and informed him that Captain Pawlus advised that he (Kokoiy) would be filing Murdoch's grievances regarding her complaints.

70. On or about October 8, 2025, Kokoiy reported to the DHPD and began to assist Murdoch with her grievances.

71. Approximately 20 minutes later, Kokoiy instructed Murdoch to go to Captain Pawlus' office, Murdoch complied, went to Captain Pawlus' office and, upon arrival, discovered that she was being hailed into an interrogation with Captain Pawlus, Captain Hatten, and Kokoiy.

72. During the October 8, 2025 interrogation, Murdoch asked for proper union representation, but her request was denied.

73. During the October 8, 2025 interrogation, Murdoch asked to leave, after Captain Hatten and Captain Pawlus began displaying aggressive behavior and asserting inaccurate facts.

74. Captain Pawlus refused to allow Murdoch to leave the interrogation, stated that Murdoch was not in any trouble, and stated that it was not an investigative meeting, but rather was 'just to talk,' but Murdoch was nonetheless not allowed to leave when she asked to leave and she was kept in the interrogation against her will.

75. During the October 8, 2025 interrogation, Captain Pawlus falsely claimed that Murdoch stated that she did not want a formal investigation into her complaints.

76. During the October 8, 2025 interrogation, Murdoch restated, again, that she requested a *formal* internal investigation into her reported complaints.

77. During the October 8, 2025 interrogation, Captain Pawlus claimed that there was a miscommunication caused by HR about whether Murdoch should have returned to work.

78. During the October 8, 2025 interrogation, Captain Pawlus told Murdoch that filing internal complaints and grievances was 'pointless.'

79. Advising Murdoch that filing internal complaints and grievances was pointless was intended to discourage protected activity and disregard Murdoch's complaints without an investigation.

80. During the October 8, 2025 interrogation, Murdoch was advised that she was cleared to return to duty.

81. During the October 8, 2025 interrogation, Murdoch reported to Defendant that she was being subject to a hostile work environment and that she wants to feel safe around Sznyr.

82. On or about October 12, 2025, Murdoch reported to Chief Haidar that she never underwent a fitness for duty assessment prior to returning to work; the

October 8, 2025 interrogation and that Captain Pawlus and Captain Hatten would not allow her to leave; she does not feel safe returning to work without a formal fitness for duty assessment; and she does not feel safe returning to work without her complaints being properly investigated.

83. On or about October 12, 2025, Murdoch reported via email to Dearborn Heights Mayor, Mo Baydoun ("Mayor Baydoun"), Chief Haidar, HR Director Fisher, and Captain Pawlus that she was not properly cleared to return to work; that Dr. Janka stated that Murdoch did not undergo a fitness for duty assessment; that she reported to HR that her assessment was not a fitness for duty assessment; that Captain Pawlus ordered her back to work in a hostile environment on 9/30/25; and that she does not feel safe returning to work without her complaints of retaliation and harassment being properly investigated.

84. On or about October 12, 2025 around 6:45 p.m., Chief Haidar called Murdoch in relation to her email regarding the fitness for duty assessment and her being improperly returned to a hostile work environment.

85. During the October 12, 2025 phone call, Murdoch reported to Chief Haidar that she believes her civil rights have been violated by Defendant.

86. During the October 12, 2025 phone call, Chief Haidar advised Murdoch that he would call HR, that Murdoch should not be at work if she did not receive

a fitness for duty assessment, and that Murdoch needed a fitness for duty assessment so that she would be able to return to work and function properly without anxiety, stress, or retaliation.

87. During the October 12, 2025 phone call, Chief Haidar advised Murdoch that the Captains would be conducting an investigation because he (Chief Haidar) instructed them to, and stated that 'they can't just not do an investigation and say that everything is okay.'

88. On or about October 13, 2025, POAM orchestrated an emergency same day appointment for Murdoch with Dr. Kenneth Wolf, Ph.D.

89. Dr. Kenneth Wolf, Ph.D. advised Chief Haidar and Murdoch's Union that, given "several reactions she has been experiencing in terms of recent work-life stresses" and "the reactions she is trying to navigate currently," he recommended that Murdoch "be put on leave while she is addressing her concerns at this time."

90. On or about October 13, 2025, Chief Haidar put Murdoch back on administrative leave.

91. On or about October 20, 2025, Murdoch was hailed into an investigative interview with Captain Hatten and Captain Pawlus.

92. During the October 20, 2025 investigative interview, Murdoch was not permitted to provide any additional information concerning her complaints that were allegedly being investigated at that time.

93. During the October 20, 2025 investigative interview, Murdoch was not permitted to report new complaints concerning incidents that occurred after her initial complaints were reported.

94. During the October 20, 2025 investigative interview, Captain Hatten advised Murdoch that she would be returning to work on 10/27/25 once the investigation into her protected complaints concluded.

95. On or about October 21, 2025, Murdoch filed a grievance (No. 25-340) concerning the improper fitness for duty assessment, in accordance with CBA Article 28 §1, and in accordance with Department Policy No. 1003.1.1 (Grievances).

96. On or about October 22, 2025, Murdoch filed a grievance (No. 25-338) alleging retaliation, hostile environment, failure to investigate, and mishandling of complaints and records regarding the patch.

97. On or about October 23, 2025, Captain Hatten emailed Murdoch, alleged that her complaints were not substantiated, and ordered Murdoch to return to work on October 27, 2025.

98. On or about October 23, 2025, Murdoch learned of communications from Defendant's HR advising Defendant's command staff to deny Murdoch's grievances based on alleged false claims and misunderstandings.

99. On or about October 27, 2025, Murdoch was forced to return to work, despite ongoing medical restrictions.

100. On or about October 28, 2025, Murdoch was referred for medical treatment with Wayne Health where she began treatment with Dr. Alireza Amirsadri, MD, the Chief Medical Officer and Director of Clinical Operations at the Department of Psychiatry at Wayne Health and Associate Chair of the Department of Psychiatry and Behavioral Neurosciences at Wayne State University.

101. Murdoch presented for treatment with Dr. Amirsadri with "clinical symptoms of depression, intense anxiety, and panic, with fear, punctuated by intense crying spells."

102. After a thorough clinical assessment on October 28, 2025, Dr. Amirsadri authored a correspondence advising Defendant that "Murdoch attending work in any capacity at this point in time, will hinder her symptoms from improving and will in fact worsen her ability to recover. . . Ms. Murdoch should not return to work tomorrow, 10/29/2025. More information will be sent after further evaluation. However, for the foreseeable future, she will need time to

start[] treatment and engage in a multimodal program including psychopharmacological treatment and psychotherapy."

103. On or about October 29, 2025, Murdoch was deemed unable to work due to psychological distress, resulting in continued absence from duty.

104. On or about October 29, 2025, POAM Business Agent, Susan Brockmann ("Brockmann"), advised Murdoch that Chief Haidar would not permit Murdoch to go on administrative leave, but would allow her to follow Dr. Amirsadri's instructions by using her accrued sick time in her leave bank, and undergo a fitness for duty assessment.

105. On or about October 29, 2025, Brockmann advised Murdoch that Chief Haidar told her (Brockmann) that all of Murdoch's grievances would be denied and that Murdoch should seek workers compensation benefits.

106. On or about October 30, 2025, Murdoch filed a grievance (No. 25-343) alleging that HR retaliated against her and improperly sent her to a return-to-work assessment, not a fitness for duty assessment, and reporting HR's mishandling of her medical documentation and complaints.

107. On or about November 3, 2025, Captain Pawlus emailed Murdoch, stating that, if she needed to be off work for 8 weeks, she must request a leave of absence; and Murdoch advised Captain Pawlus that he was wrong because it

was not a personal leave of absence under Article 551 §4 of the CBA, rather it was a doctor's order due to her workplace conditions.

108. On or about November 5, 2025, Brockmann sent an email request to Mayor Baydoun and his counsel seeking a meeting with Defendant to begin Step 3 of the grievance process, as is required by the CBA.

109. On or about November 13, 2025, Defendant engaged in unfair labor practices and refused to meet with Murdoch in relation to Step 3 of the grievance process required by the CBA.

110. On or about November 21, 2025, POAM President James Tignanelli ("Tignanelli") emailed Murdoch stating that he was in the process of finding a time to meet with Mayor Beydoun, asked Murdoch what her desired outcome was, and indicated that Defendant needed a 'target' but was not starting the investigation over.

111. On or about November 21, 2025, Tignanelli asked Murdoch, via email, if she had an interest in continued service with Defendant.

112. On or about November 21, 2025, Murdoch advised Tignanelli that she wanted to return to work for Defendant, she wanted Defendant to acknowledge the impact it had on her mental health, she wanted Defendant to allow her to get the treatment she required, and she wanted Defendant to investigate her complaints.

113. On or about November 21, 2025, Tiganelli asked Murdoch if she would accept a disability, retirement, and/or severance package from her employment with Defendant and threatened her financial interests by stating that 'a lot of lines would have to intersect for you to work the number of years necessary to get to pension eligibility.'

114. On or about November 25, 2025, in accordance with Murdoch's rights under the CBA, Brockmann provided Defendant with notice of Murdoch's intent to arbitrate Grievances 25-326, 25-339, 25-340, and 25-343.

115. On or about December 10, 2025, Murdoch submitted a FOIA request seeking records related to Administrative Investigation 25-06, including interviews and evidence.

116. On or about December 14, 2025, Murdoch submitted a formal complaint to Mayor Baydoun and his counsel via a Michigan Employment Relations Commission Charge ("MERC Charge") relating to multiple unfair labor practices.

117. On or about December 15, 2025, Defendant denied Murdoch's 12/10/25 FOIA Request, asserting the investigation is "open," despite prior communication from Defendant alleging the investigation had been completed.

118. On or about December 15, 2025, Murdoch appealed her FOIA Request's denial, challenging the stated basis and asserting inconsistency in the investigation's status.

119. On or about December 17, 2025, Defendant issued a FOIA response extension notice and maintained its denial based on alleged statutory exemptions, including interference with law enforcement proceedings.

120. On or about December 17, 2025, Chief Haidar advised Murdoch via email that her sick time was set to run out on 12/23/25 and she must return to work on 12/31/25.

121. On or about December 22, 2025, Corporation Counsel, Gary Miotke ("Miotke"), emailed Murdoch advising that a meeting was held concerning her grievances, informing her that all grievances were denied, and alleging that an investigation into Murdoch's claims was already conducted.

122. On or about December 22, 2025, Murdoch provided her Shift Supervisor, David Mahood ("Mahood"), Captain Pawlus, and Chief Haidar with correspondence from her physician requesting that Murdoch stay off work for 6 more weeks to complete her treatment plan prior to returning to the workplace.

123. On or about December 22, 2025, Murdoch submitted an accommodation request for her disability to Mahood, Captain Pawlus, and Chief Haidar,

requesting to use her other leave banks, such as furlough, comp time, and/or personal time, to comply with her doctor's order that she remain off work.

124. Murdoch submitted her 12/22/25 request for reasonable accommodation with a doctor's note stating she required additional time off to complete treatment, and with a request to use other personal paid time off leave banks of approximately 370 hours that she then maintained.

125. As of approximately December 23, 2025, Murdoch had exhausted all accrued sick leave benefits and her 12/22/25 request to use furlough, comp time, and/or personal time remained unanswered.

126. On or about December 29, 2025, Murdoch emailed Mayor Baydoun, Chief Haidar, Miotke, Captain Pawlus, and Brockmann advising them that her paycheck reflected unpaid time off despite her 12/22/25 accommodation request.

127. Defendant failed to respond to Murdoch's 12/22/25 and 12/29/25 requests for reasonable accommodation.

128. On or about December 30, 2025, LaMontaine advised Murdoch that her grievances would not be pursued in arbitration, citing the legal department's rationale of, "if the Grievant can establish a link to protected traits, filing a civil rights claim against the City should occur."

129. On or about December 31, 2025, Murdoch did not receive an accurate paycheck.

130. On or about December 31, 2025, Murdoch advised Captain Pawlus via email that, due to the revocation of her paycheck, she was requesting to return to work on 1/13/26.

131. On or about January 2, 2026, Local 4 News Detroit reported on Sznyr's false narrative that the patch was for Ramadan and the revocation of Murdoch's paycheck whilst having approximately 370 hours of available leave time in her paid time off banks.

132. Murdoch was interviewed by Local 4 News Detroit, made only truthful statements, and was subject to further retaliation as a result.

133. On or about January 7, 2026, Murdoch's 12/22/25 and 12/29/25 emails were finally responded to by Captain Pawlus, only, and only to state that he would accommodate Murdoch's return to work in accordance with policy.

134. Accordingly, Defendant denied Murdoch's 12/22/25 and 12/29/25 requests for reasonable accommodation to accommodate her disability and refused to engage in an interactive process.

135. On or about January 14, 2026, Murdoch returned to work against her doctor's instructions, as she was ordered to do by Defendant.

136. On or about January 22, 2026, Murdoch inspected her personnel file and discovered that no documents concerning Administrative Investigation 25-06 were in her file, in violation of Department Policy No. 1013.5 (Internal Affairs File).

137. On or about January 28, 2026, while investigating a call for service, Murdoch made a joke with her colleagues that the suspect was running out of the front of the subject residence, and Captain Pawlus alleged that Murdoch's statement caused Ofc. Fayad to draw his weapon from his holster.

138. At the time of the 1/28/26 call for service, Murdoch was still integrating back into the workplace and was being observed by a Field Training Officer ("FTO") during her first 5 shifts back at work.

139. At the time of the 1/28/26 call for service, Murdoch was working alongside Ofc. Shokr, who made no mention of Murdoch's joke and did not address it at any point in time.

140. A review of the relevant body camera footage from the 1/28/26 call for service revealed that Ofc. Fayad did not draw his gun as Captain Pawlus had falsely alleged.

141. As a result of the 1/28/26 incident, and notwithstanding body camera footage, Murdoch was disciplined (Discipline Case No. 26-01) and suspended for 5 days without pay.

142. On or about February 8, 2026, Murdoch was responding to a call for service and asked the dispatcher to send her the call for service, but Kokoiy responded over the radio aggressively and rudely shouting, 'Negative. Negative. We will be handling for training.'

143. Once Murdoch was on scene, she asked Kokoiy who he was talking to on the radio because Murdoch was the senior patrol officer on her shift, and senior officers are not typically questioned by junior patrol officers.

144. Kokoiy raised his voice at Murdoch and disputed the fact that his trainee was sick, however, Trainee Gracsia had notified Murdoch earlier in the shift that she was sick.

145. This February 8, 2026 incident led to Murdoch being disciplined with a 1-day suspension (Discipline Case No. 2602) and permanent loss of her Field Training Officer position.

146. On or about February 17, 2026, Murdoch was removed from roll call by Szopko and was taken to meet with Captain Pawlus without notice.

147. During the February 17, 2026 meeting, Captain Pawlus stated to Murdoch that her behavior was impeding the conditional functional operation of the police department, Murdoch asked what that meant, and Captain Pawlus advised that he was not going to 'gossip' about things that have not been investigated.

148. Murdoch worked a total 10 shifts from the time she returned to work and when she was placed on administrative leave by Captain Pawlus.

149. Of these 10 shifts, Murdoch rode with Shokr for 5, trained Ofc. Gracsia for 2, went home early once, and worked 2 full shifts alone.

150. During these 10 shifts, Murdoch was issued 2 separate suspensions and a corrective training that was not issued until after her termination.

151. During the February 17, 2026 meeting, Captain Pawlus ordered Murdoch onto administrative leave, pending a fitness for duty assessment.

152. During the February 17, 2026 meeting, Captain Pawlus ordered Murdoch to surrender her duty weapons.

153. During the February 17, 2026 meeting, Captain Pawlus verbally ordered Murdoch to immediately report to First Choice Urgent Care to submit to a *random* drug screening.

154. Captain Pawlus further provided Murdoch with a hand-signed authorization for the drug screening, which also cited that the test was being ordered under 'random' in conjunction with his verbal order to submit to random drug screening.

155. Murdoch complied with Captain Pawlus's demands, surrendered her duty weapons, and presented for the drug screening where she was forced to urinate while being observed.

156. Upon conclusion of Murdoch's drug screening, she was provided with a Federal Custody Control Form citing that the test was a FMCSA, DOT, Random Test.

157. 49 CFR §40.13(h) provides that, "[n]o one is permitted to conduct a DOT drug or alcohol test on an individual who is not a DOT-regulated employee, as defined by the DOT agency regulations."

158. Murdoch was not a DOT-regulated employee – she did not even possess a commercial driver's license ("CDL").

159. Murdoch is not aware of any other DHPD officers being subjected to *random* drug testing or *reasonable suspicion* drug testing during her 9-year tenure with the DHPD.

160. Murdoch is not aware of any other DHPD officers being subjected to DOT drug or alcohol testing during her 9-year tenure with the DHPD.

161. Murdoch tested positive for THC and amphetamines; this becomes the central basis for subsequent disciplinary action and wrongful termination.

162. THC is the primary compound in cannabis and Murdoch used THC for sleep due to the stress from the retaliation and hostile environment.

163. Murdoch tested positive for amphetamines because she took her prescription Adderall medication, as prescribed.

164. Captain Pawlus issued discipline (Discipline No. 26-03) to Murdoch because she tested positive for amphetamines.

165. Disciplining Murdoch for taking her prescribed medications constitutes disability harassment and discrimination.

166. On or about February 18, 2026, Murdoch filed a grievance (No. 26-67) alleging that the drug screening ordered by Captain Pawlus was not random and was unlawfully conducted.

167. On or about February 18, 2026, Grievance No. 26-67 was denied at Steps 1 and 2 by Mahood, as well as Captain Pawlus who failed to elaborate on whether the order for drug screening was random, or not.

168. On or about February 18, 2026, Murdoch requested that Defendant, pursuant to Michigan's Public Employment Relations Act ("PERA"), provide the random data which selected Murdoch to undergo the *random* drug screening.

169. On or about February 20, 2026, Murdoch received an email in response to her inquiry about the drug screening from a safety investigator for the FMCSA DOT Michigan Division, who advised Murdoch that no one is permitted to conduct a DOT test on anyone who is not a DOT-regulated employee and that having Murdoch submit to the drug testing was an improper use of the custody and control form, per 49 CFR §40.13(h).

170. On or about February 20, 2026, a MRO, Kirk Roberts ("MRO Roberts"), called Murdoch to discuss the DOT drug test results and Murdoch informed MRO Roberts that she was not a DOT-regulated employee, she did not maintain a CDL, and she has a prescription for Adderall.

171. On or about February 24, 2026, the new Chief of Police, Michael Guzowski ("Chief Guzowski"), responded to Murdoch's PERA request, denied her grievance concerning the observed drug screening, and did not provide the requested random data.

172. On or about February 24, 2026, Chief Guzowski shifted Defendant's justification for the drug screening from *random* to *reasonable suspicion*, stating that "the drug test administered to Officer Emily Murdoch was not conducted pursuant to the City's random testing program but was ordered under the Reasonable Suspicion provisions of the City's Drug and Alcohol Testing Policy based upon documented supervisory observations of erratic behavior."

173. On or about February 24, 2026, Murdoch emailed Chief Guzowski; requested that Defendant, pursuant to PERA, provide all evidence it believes shows that there was reasonable suspicion to force Murdoch to submit to drug screening in accordance with policy; and challenged the post hoc shifting justification authorizing the observed search and seizure of her urine.

174. Defendant failed to respond to Murdoch's 2/24/26 request.

175. On or about February 26, 2026, Murdoch attended the fitness for duty assessment ordered by Defendant on 2/18/26, which was conducted by Dr. Love, a retired Michigan State Police Captain.

176. During the February 26, 2026 fitness for duty assessment, Murdoch explained the events in her workplace which led to her mental health crisis, Murdoch informed Dr. Love that she uses THC for sleep, Dr. Love was not concerned with Murdoch's THC usage, and Dr. Love advised Murdoch that she was fit for duty and could return to work.

177. On or about February 28, 2026, Murdoch withdrew Grievance No. 26-67 because of Defendant's admission that the drug screening was not random and its post hoc justification declaring that there was reasonable suspicion for the drug testing.

178. In or about March of 2026, Defendant conducted an Internal Affairs investigation (No. 26-03) into Murdoch.

179. On or about March 13, 2026, Murdoch was disciplined and issued a Letter of Reprimand concerning the 1/27/26 and 2/8/26 incidents, which stated that "Murdoch's conduct towards a co-worker, in front of an FTEP officer and civilian, was out of character from her normal demeanor, unprofessional and

not acceptable," and was ordered to appear at the DHPD on 3/26/26 for another Internal Affairs investigation..

180. On or about March 26, 2026, Murdoch was subject to a disciplinary interview in conjunction with Internal Affairs Investigation No. 26-03.

181. Internal Affairs Investigation No. 26-03 concluded with findings citing policy violations, including alleged substance use, dishonesty, and failure to self-report mental health concerns.

182. On or about March 26, 2026, Sgt. Joseph Reyna ("Reyna"), Mahood, and Sznyr presented to Murdoch's home residence and seized a Daniel Defense AR-15 short barrel rifle, a suppressor and all accessories, all police identification cards, and all Department-issued identification and equipment.

183. On or about March 30, 2026, Murdoch filed a grievance (No. 26-116) alleging that she was issued excessive discipline without just cause regarding the 1/28/26 incident, requesting to be paid for 40 hours of pay that she was deprived of, requesting that she be immediately returned to the capacity of Field Training Officer, and requesting dismissal and removal of Discipline No. 26-01 from her personnel file.

184. On or about May 1, 2026, Defendant terminated Murdoch's employment based on findings from Internal Affairs Investigation 26-03, including alleged

drug policy violations, lack of candor, and failure to report fitness-for-duty concerns.

185. On or about May 14, 2026, Murdoch was notified that a public hearing with the City of Dearborn Heights Act 78 Civil Service Commission concerning Grievance No. 26-116 was scheduled to occur on 5/19/26.

186. On or about May 15, 2026, Secretary Mickey Wiewiura ("Secretary Wiewiura") advised Murdoch that she would be able to present witnesses at the 5/19/26 hearing and requested that Murdoch provide the witnesses' names to "make sure they are there."

187. On or about May 15, 2026, Murdoch provided Secretary Wiewiura with the names of 8 witnesses who she sought to have testify at the 5/19/26 hearing.

188. On or about May 19, 2026, a public hearing was held concerning Grievance No. 26-116 and Murdoch was not permitted to present any witnesses.

189. Upon information and belief, Defendant intentionally failed to take any reasonable steps to ensure that any of Murdoch's 8 witnesses would be present to testify at the 5/19/26 hearing.

190. On or about June 28, 2026, Grievance No. 26-116 was denied by the City of Dearborn Heights Act 78 Civil Service Commission.

191. Murdoch was not informed of Grievance No. 26-116 being denied by the Civil Service Commission until July 26, 2026, after numerous unanswered follow up emails.

192. On or about September 9, 2026, Murdoch filed an appeal to the Civil Service Commission's 6/28/26 decision and that matter was assigned Wayne County Circuit Court Case No. 26-015757-AA.

## COUNT 1 – VIOLATION OF AMERICANS WITH DISABILITIES ACT (FAILURE TO ACCOMMODATE) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS

193. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

194. As a result of her employment conditions, Plaintiff suffers from several serious medical conditions, including depression, psychological distress, intense anxiety, as well as panic with fear, punctuated by intense crying spells, which have resulted in a disability.

195. Plaintiff was a qualified individual with a disability, as that term is defined by the Americans with Disabilities Act, and 42 USC §12101, et. seq. (as amended) ("ADA").

196. Plaintiff has a disability as that term is defined by the ADA.

197. At all relevant times, Defendant was aware of Plaintiff's disability.

198. Defendant had early and continuing knowledge of Plaintiff's condition and disability, as demonstrated by workplace discussions of distress, placing Plaintiff of administrative and/or stress leave, Defendant ordering fitness-for-duty and/or psychological evaluations, Defendant's receipt of medical documentation, and ongoing updates provided to Defendant by Plaintiff and her treating physicians.

199. Plaintiff repeatedly communicated her need for reasonable accommodation through physician documentation recommending leave or restrictions, requests to remain off work or return safely, and ongoing communications with HR, her command, and her Union.

200. Plaintiff made numerous requests for reasonable accommodation, as fully explained herein above.

201. Plaintiff engaged in an interactive process with Defendant regarding the structure, timing and other factors related to her requests for reasonable accommodation.

202. Such reasonable accommodations would not be an undue burden on Defendant.

203. Defendant failed and refused to grant reasonable accommodations to Plaintiff.

204. Defendant did not implement a structured accommodation process, as shown by a lack of interactive dialogue, Defendant refusing to explore alternate

accommodations such as modified duty, extended leave, or reassignment, and Defendant's failure to communicate alternate accommodation options.

205. Defendant's evaluation of Plaintiff's medical information was inconsistent, as documented by conflicting medical opinions that were not reconciled, selective reliance on certain documentation, and confusion between return-to-work and fitness-for-duty standards.

206. Plaintiff was required to return to work despite ongoing medical restrictions, without resolution of her prior medical concerns, and without a clearly documented clearance process.

207. Defendant's decision to force Plaintiff to return to work did not reflect full consideration of the available medical evidence and did not address workplace conditions contributing to her condition and disability.

208. Defendant later used Plaintiff's medical condition and disability in disciplinary action, citing failure to report mental health concerns and referencing fitness-for-duty violations.

209. Defendant used Plaintiff's disability as a basis for her removal from work, discipline, and termination.

210. Defendant forced Plaintiff to return to the same work environment associated with her disability, which undermined her medical recommendations and contributed to continued distress.

211. Defendant failed to properly evaluate and accommodate Plaintiff's disability, including establishing a consistent or interactive accommodation process.

212. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has suffered damages, including but not limited, loss of job position, lost past and future wages, lost past and future employment benefits, loss of earning capacity, emotional distress, costs, and attorney fees.

**COUNT 2 – VIOLATION OF AMERICANS WITH DISABILITIES ACT**
**(DISABILITY DISCRIMINATION)**
**AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

213. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

214. Plaintiff was, at all relevant times, a disabled person within the meaning of the Americans with Disabilities Act, 42 USC §12101, *et seq*.

215. Defendant regards Plaintiff as having a disability.

216. Plaintiff is qualified for her employment position, with or without reasonable accommodation.

217. Plaintiff's disability, condition, and limitations were known to Defendant.

218. Plaintiff engaged in protected activity by making complaints, opposing Defendant's conduct, filing grievances, submitting written complaints to HR, submitting FOIA requests and appeals, among others stated herein above.

219. Defendant had knowledge of Plaintiff's protected activity, as her complaints were formally tracked, and Defendant's leadership, HR, and lawyers were involved.

220. Following Plaintiff engaging in protected activity, Defendant took adverse employment actions, including administrative leave and fitness-for-duty assessments, among others stated herein.

221. Defendant's disability discrimination is made further apparent by the procedural irregularities in grievance handling, Defendant's failure to resolve Plaintiff's complaints, and Defendant denying and obstructing Plaintiff's access to witnesses and information.

222. Defendant altered Plaintiff's employment conditions because of her disability by placing Plaintiff on administrative leave, requiring Plaintiff undergo multiple evaluations, and forcing Plaintiff to return to work.

223. Plaintiff's forced to return to work occurred after she made multiple complaints and continued to assert her rights.

224. Defendant's discriminatory actions escalated over time to include drug testing with observed urination, discipline, and termination.

225. The pattern reflects escalation in Defendant's disability discrimination after Plaintiff engaged in protected activity.

226. The timing and sequence of events support a causal connection between the protected activity and disability discrimination.

227. The cumulative effect of these actions reflects materially adverse changes in Plaintiff's employment conditions occurring in close proximity to the protected activity and under circumstances suggesting retaliatory motivation.

228. Plaintiff has suffered an adverse employment action.

229. The adverse employment actions taken by Defendant were made because of Plaintiff's disability.

230. Plaintiff was subjected to the adverse employment action because of an actual or perceived physical or mental impairment.

231. Plaintiff returned to work on 10/27/25 despite medical documentation, without resolving prior concerns, and without a consistent evaluation process.

232. Defendant's handling of the medical evidence included selective reliance and a disregard of treating provider input and orders.

233. The lack of structure indicates that Plaintiff's condition was not fully or fairly evaluated by Defendant.

234. The return-to-work decision altered Plaintiff's employment conditions by requiring her work under unresolved limitations and re-exposing her to a harmful environment.

235. These actions constitute a material change in employment conditions tied to disability.

236. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has suffered damages, including but not limited: loss of job position, lost past and future wages, lost past and future employment benefits, loss of earning capacity, emotional distress and attorney fees.

**COUNT 3 – VIOLATION OF AMERICANS WITH DISABILITIES ACT (RETALIATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

237. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

238. Plaintiff engaged in protected activity when she made complaints and filed grievances opposing Defendant's violations of the ADA, as more fully described above.

239. Defendant had knowledge of Plaintiff's protected activity.

240. Defendant failed and refused to take any action regarding the disability discrimination of Plaintiff.

241. Following protected activity, Defendant took adverse employment actions, as fully explained herein.

242. As a direct result of, and in retaliation for, Plaintiff's opposition to Defendant's violations of the ADA, Plaintiff was disciplined and terminated, as fully explained herein.

243. The timing and sequence of these events reveals a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

244. The cumulative effect of these actions reflects materially adverse changes in Plaintiff's employment conditions occurring in close proximity to the protected activity and under circumstances revealing Defendant's retaliatory motivation.

245. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to: lost past and future wages, loss of earning capacity, and severe emotional distress.

## COUNT 4 – VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT
## (FAILURE TO ACCOMMODATE)
## AS TO DEFENDANT CITY OF DEARBORN HEIGHTS

246. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

247. Plaintiff was a qualified individual with a disability, as that term is defined by the Persons with Disabilities Civil Rights Act, M.C.L. §37.1101, *et seq.* ("PDCRA").

248. Plaintiff has a disability as that term is defined by the PDCRA.

249. Defendant was aware of Plaintiff's disability.

250. Plaintiff made requests for reasonable accommodation as fully explained herein above.

251. Plaintiff engaged in an interactive process with Defendant regarding the structure and other factors related to her requests for reasonable accommodation.

252. Such reasonable accommodations were not an undue burden on Defendant.

253. Defendant failed and refused to grant reasonable accommodation to Plaintiff.

254. The actions of Defendant and its agents, representatives, and employees were intentional in their disregard for the rights and sensibilities of Plaintiff.

255. As a direct and proximate result of Defendant's violation of the PDCRA, Plaintiff sustained injuries and damages, including but not limited to, loss of job position, loss of career opportunities, lost past and future wages, lost past and future employment benefits, loss of earning capacity, cost, attorney fees, mental and emotional distress, humiliation and embarrassment, and loss of the

ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

## COUNT 5 – VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (DISABILITY DISCRIMINATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS

256. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

257. Plaintiff is a disabled person within the meaning of the PDCRA.

258. Defendant regards Plaintiff as having a disability.

259. Plaintiff is qualified for her position of employment with Defendant, with or without reasonable accommodation.

260. Plaintiff suffered adverse employment actions, including but not limited to discipline and discharge.

261. The adverse employment actions taken by Defendant was made because of Plaintiff's disability and were pretext for disability discrimination.

262. Further, Plaintiff was subjected to the adverse employment action because of an actual or perceived physical or mental impairment.

263. As a direct and proximate result of Defendant's disability discrimination, Plaintiff has suffered damages, including but not limited to: loss of job position, loss of career opportunities, lost past and future wages, lost past and future employment benefits, loss of earning capacity, attorney fees, mental

and emotional distress, humiliation and embarrassment, and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

## COUNT 6 – VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT (RETALIATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS

264. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

265. Plaintiff engaged in protected activities via making complaints and filing grievances opposing Defendant's disability discrimination and violation of the PDCRA.

266. Defendant had knowledge of Plaintiff's protected activity.

267. Defendant failed and refused to take any action regarding the disability discrimination of Plaintiff.

268. Following protected activity, Defendant took adverse employment actions.

269. As a direct result of, and in retaliation for, Plaintiff's opposition to Defendant's violations of the PDCRA, Plaintiff was disciplined and terminated, as fully explained herein above.

270. The timing and sequence of these events reveal a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

271. The cumulative effect of these actions reflects materially adverse changes in Plaintiff's employment conditions occurring in close proximity to the protected activity and under circumstances revealing Defendant's retaliatory motivation.

272. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to: lost past and future wages, loss of earning capacity and severe emotional distress.

**COUNT 7 – VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT**
**(RACE DISCRIMINATION)**
**AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

273. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

274. Title VII of the Civil Rights Act of 1964 ("Title VII"), specifically 42 USC §2000e-2, provides that "it shall be an unlawful employment practice for an employer… to… discharge…or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race…"

275. At all relevant times, Plaintiff was an employee of Defendant's and Defendant was Plaintiff's employer as those terms are defined by Title VII.

276. Plaintiff is a member of a protected class.

277. Plaintiff associated with the race of White (Middle Eastern Origin).

278. At all relevant times, Plaintiff was qualified for the position of police officer.

279. Plaintiff suffered adverse employment actions, including but not limited to, reprimand, discipline, and discharge.

280. Defendant's stated reasons for the adverse employment actions were false.

281. Defendant's stated reasons for the adverse employment actions were pretext for discriminating against Plaintiff for associating with persons of the race of White (Middle Eastern Origin).

282. Other employees who did not associate with persons of the White (Middle Eastern Origin) race were not subjected to the same adverse employment actions as Plaintiff.

283. Plaintiff was discharged because of her association with members of the White (Middle Eastern Origin) race.

284. Racial considerations motivated Defendant's conduct.

285. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered damages including, but not limited to, lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs, and attorney fees.

## COUNT 8 – VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT (RACE HARASSMENT) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS

286. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

287. At all material times, Plaintiff was an employee, and Defendant was her employer, covered by and within the meaning of 42 USC §2000e *et seq*.

288. Plaintiff was harassed by Defendant's agents and employees throughout the course of her employment because of her association with persons of the White (Middle Eastern Origin) race, as fully explained herein, constituting disparate treatment and impact on Plaintiff.

289. Plaintiff complained about harassment, discrimination, and the events described herein to Defendant.

290. Defendant did not promptly remedy the ongoing harassment when Plaintiff complained.

291. Defendant permitted the harassment to continue.

292. The conduct of Defendant's agents and employees in harassing Plaintiff because she associated with persons of the White (Middle Eastern Origin) race constitutes race discrimination in violation of Title VII.

293. Racial considerations motivated Defendant's conduct.

294. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs, and attorney fees.

**COUNT 9 – VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT (RETALIATION FOR OPPOSING RACE HARASSMENT AND DISCRIMINATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

295. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

296. Plaintiff engaged in protected activity when she complained to Defendant about harassment and discrimination by Defendant's employees due to her association with the White (Middle Eastern Origin) race, as fully explained herein above.

297. Plaintiff's protected activity was known to Defendant.

298. Defendant failed and refused to take any action regarding the harassment and discrimination of Plaintiff.

299. Plaintiff suffered adverse employment actions, including reprimand and discharge.

300. There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

301. Racial considerations motivated Defendant's conduct.

302. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to, lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs, and attorney fees.

**COUNT 10 – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT (RACE HARASSMENT) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

303. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

304. At all material times, Plaintiff was an employee, and Defendant was her employer, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. §37.2101 *et seq*. ("ELCRA").

305. Plaintiff was harassed by Defendant's agents and employees throughout the course of her employment because of her association with persons of the White (Middle Eastern Origin) race, constituting disparate treatment and impact on Plaintiff.

306. Racial considerations motivated Defendant's conduct.

307. Plaintiff complained about harassment, discrimination, and the events described herein to Defendant.

308. Defendant did not promptly remedy the ongoing harassment when Plaintiff complained.

309. Defendant permitted the harassment to continue.

310. The conduct of Defendant's agents and employees in harassing Plaintiff because of her association with the White (Middle Eastern Origin) race constitutes racial discrimination in violation of the ELCRA.

311. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs, and attorney fees.

**COUNT 11 – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT (RETALIATION FOR OPPOSING RACE HARASSMENT AND DISCRIMINATION)**
**AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

312. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

313. The ELCRA, specifically M.C.L. §37.2202, *et seq*., provides that an employer shall not "discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of… race…" M.C.L. §37.2202(1)(a).

314. Plaintiff was an employee of Defendant's and Defendant was Plaintiff's employer, as those terms are defined by the ELCRA.

315. Plaintiff is a member of a protected class.

316. Plaintiff was qualified for the position of police officer.

317. Plaintiff engaged in protected activity when she complained to Defendant about the racial discrimination, as more fully described above.

318. Defendant failed and refused to take any action regarding the racial discrimination of Plaintiff.

319. Plaintiff suffered adverse employment actions, including but not limited to, reprimand, discipline, and discharge.

320. Defendant's stated reasons for the adverse employment actions were false and pretext for race discrimination.

321. Other employees who did not associate with the White (Middle Eastern Origin) race were not subjected to the same adverse employment actions as Plaintiff.

322. Plaintiff was discharged because of her association with the White (Middle Eastern Origin) race.

323. Racial considerations motivated Defendant's conduct.

324. There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

325. As a direct and proximate result of Defendant's violation of ELCRA, Plaintiff has suffered damages, including, but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs, and attorney fees.

**COUNT 12 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT (NATIONAL ORIGIN HARASSMENT AND DISCRIMINATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

326. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

327. 42 U.S.C. §2000e-2(a)(1), provides that "it shall be an unlawful employment practice for an employer… to… discharge…or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's…national origin."

328. At all relevant times, Plaintiff was an employee of Defendant's and Defendant was her employer as those terms are defined by Title VII.

329. Plaintiff is a member of a protected class.

330. Plaintiff was qualified for the position of police officer.

331. Plaintiff suffered adverse employment actions, as fully explained herein above, because of her association with persons of Middle Eastern national origin.

332. Defendant's stated reasons for the adverse employment actions were false and pretext for national origin discrimination.

333. Other employees who did not associate with persons of Middle Eastern national origin were not subjected to the same adverse employment actions as Plaintiff.

334. There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

335. National origin considerations motivated Defendant's conduct.

336. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered damages, including, but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, and emotional distress.

**COUNT 13 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT (RETALIATION FOR REPORTING AND OPPOSING NATIONAL ORIGIN HARASSMENT AND DISCRIMINATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS**

337. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

338. Plaintiff engaged in protected activity when she complained to Defendant about the national origin harassment and discrimination by Defendant's employees, as fully explained herein above.

339. Defendant failed and refused to take any action regarding the discrimination.

340. Plaintiff suffered adverse employment actions, including reprimand and discharge.

341. There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

342. National origin considerations motivated Defendant's conduct.

343. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to lost past and future wages, loss of earning capacity, severe emotional distress, costs, and attorney fees.

## COUNT 14 – VIOLATION OF ELCRA (NATIONAL ORIGIN HARASSMENT AND DISCRIMINATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS

344. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

345. The ELCRA provides that an employer shall not "discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of… national origin…" M.C.L. §37.2202(1)(a).

346. Plaintiff was an employee of Defendant's and Defendant was her employer as those terms are defined by the ELCRA.

347. Plaintiff is a member of a protected class.

348. Plaintiff was qualified for the position of police officer.

349. Plaintiff suffered adverse employment actions, as fully explained herein above, because she associated with persons of Middle Eastern national origin.

350. Defendant's stated reasons for the adverse employment actions were false and pretext for national origin discrimination.

351. Other employees who did not associate with persons of Middle Eastern national origin were not subjected to the same adverse employment actions as Plaintiff.

352. There is a causal connection between the protected activity and adverse employment actions taken against Plaintiff.

353. National origin considerations motivated Defendant's conduct.

354. As a direct and proximate result of Defendant's violation of the ELCRA, Plaintiff has suffered damages, including but not limited to, lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs, and attorney fees.

## COUNT 15 – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT (RETALIATION FOR OPPOSING NATIONAL ORIGIN DISCRIMINATION) AS TO DEFENDANT CITY OF DEARBORN HEIGHTS

355. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

356. Plaintiff engaged in protected activity when she complained to Defendant about the repeated national origin harassment and discrimination by Defendant's employees, as fully explained herein above.

357. Plaintiff's protected activity was known to Defendant.

358. Defendant failed and refused to take any action regarding the harassment and discrimination of Plaintiff.

359. Plaintiff suffered adverse employment actions, including reprimand and discharge.

360. There is a causal connection between the protected activity and adverse employment actions taken against Plaintiff.

361. National origin considerations motivated Defendant's conduct.

362. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs, and attorney fees.

## COUNT 16 – VIOLATION OF 42 USC §1983 FOURTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION (UNCONSTITUTIONAL SEARCH AND SEIZURE) AS TO DEFENDANTS, CITY OF DEARBORN HEIGHTS AND SHAUN PAWLUS

363. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

364. 42 USC §1983 states that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for…

365. Plaintiff is a citizen of the United States and Defendants are persons pursuant to 42 USC §1983.

366. At all times relevant hereto, Defendants were acting under the color of state law.

367. Defendants, acting under color of state law and in concert with one another, by their conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

368. Plaintiff is guaranteed, and has the following clearly established rights:

    a. The right to be secure in her persons, houses, papers, and effects, against unreasonable searches and seizures.

369. In committing or permitting the acts complained of herein, Defendants acted under the color of law to deprive Plaintiff of her rights under the Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to, unreasonably searching and seizing Plaintiff's urine.

370. Defendants' actions and omissions as stated in this Complaint deprived Plaintiff of the privileges and immunities secured by the United States Constitution.

371. Defendants' conduct was motivated by an evil motive or intent.

372. Defendants' conduct involved reckless or callous indifference to the federally protected rights of Plaintiff.

373. As a direct and proximate result of Defendants' violations of the United States Constitution and 42 USC §1983, Plaintiff suffered injury and damages.

374. Further, evaluation of the nature of Defendants' conduct, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent reveals that punitive damages are warranted.

WHEREFORE, Plaintiff Emily Murdoch prays that this Honorable Court enter judgment in her favor against Defendants, City of Dearborn Heights and Shaun Pawlus, jointly and severally, in an amount that this Court deems fair and just, plus costs, interest, and attorney fees.

**JURY DEMAND**

Plaintiff Emily Murdoch hereby demands a trial by jury of the within cause.

Respectfully submitted,

STEMPIEN LAW, PLLC

*/s/ Mallorie M. Blaylock-Danna*
Mallorie M. Blaylock-Danna (P84331)
Attorney for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
P/F: 734-744-7002
mallorie@stempien.com

Dated: October 2, 2026